**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**

Select Rehabilitation, LLC,

        Plaintiff

EmpowerMe Rehabilitation Kentucky LLC,
Jennifer Keeney, Michael Kelly, Katelin
Parsley, Lisa Kearny, Stacy Boren,  Jeremy
Darnell, Douglas Skinner, and Miranda Hunt

        Defendants.

No. 1:21-cv-39-GNS

---

**VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, PERMANENT INJUNCTIVE RELIEF,
DAMAGES AND OTHER RELIEF FOR VIOLATION OF THE COMPUTER FRAUD
AND ABUSE ACT, MISAPPROPRIATION OF TRADE SECRETS AND OTHER
MISCONDUCT**

Diane Gianos Walker (*pro hac vice* to be filed)
Kristen Wolfe Roberts (*pro hac vice* to be filed)
Robert Smeltzer (*pro hac vice* to be filed)
WALKER MORTON LLP
Two Prudential Plaza
180 North Stetson Avenue, 47th Floor
Chicago, IL 60601
Telephone: (312) 471-2900
Facsimile: (312) 471-6017
dwalker@walkermortonllp.com
kroberts@walkermortonllp.com
rsmeltzer@walkermortonllp.com

David B. Goroff (*pro hac vice* to be filed)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 3000
Chicago, IL  60654
Telephone:  (312) 832-4500
Facsimile:  (312) 832.4700
dgoroff@foley.com

and

T. Kent Barber
KY Bar No. 092456
Barber Law PLLC
2200 Burrus Drive
Lexington, KY 40513
Telephone: (859) 296-4372
kbarber@barberlawky.com

*Attorneys for Select Rehabilitation, LLC*

Plaintiff Select Rehabilitation LLC ("Select"), as its Verified Complaint against Defendants EmpowerMe Rehabilitation Kentucky LLC ("EmpowerMe"), Jennifer Keeney ("Keeney"), Michael Kelly ("Kelly"), Katelin Parsley ("Parsley"), Lisa Kearny ("Kearny"), Stacy Boren ("Boren"), Jeremy Darnell ("Darnell"), Douglas Skinner ("Skinner"), and Miranda Hunt ("Hunt")[1] (together "Defendants"), states:

## I.    NATURE OF CASE

1.      Select provides therapy services, including physical therapy ("PT"), occupational therapy ("OT"), and speech and language therapy ("ST"), to patients who reside in assisted living ("AL") and independent living ("IL") facilities in Bowling Green, Kentucky, including Massey Springs Senior Living ("Massey Springs") (operated by the GoodWorks Unlimited LLC ("GoodWorks")), as well as Morningside of Bowling Green ("Morningside"), Arcadia Senior Living ("Arcadia"), Charter Senior Living ("Charter") and Chandler Park Assisted Living ("Chandler") (collectively, the "Facilities").

2.      As set forth in more detail below, this action involves Defendants' unlawful scheme (the "Scheme") to take Select's patients, therapists and revenue at the Facilities.  The Scheme included several key steps: (1)  Keeney, a former Agency Administrator for the Facilities at Select, resigned in late December or early January of 2021 to join its direct competitor in the same market, EmpowerMe; (2) Keeney immediately recruited Kelly, Select's then-Program Director for the Facilities, to join her at EmpowerMe; (3) before leaving Select, however, Kelly, induced by Keeney and EmpowerMe and with their full knowledge, repeatedly breached his fiduciary duties to Select by misappropriating its trade secrets and soliciting its Therapists on EmpowerMe's

---

[1] All Defendants except EmpowerMe are together the "Individual Defendants." The Individual Defendants other than Keeney and Kelly are the "Therapists." The term "Therapists" in this Complaint include physical therapists ("PTs"); Occupational Therapists ("OTs"), Speech and Language Pathologists ("SLPs"); Certified Occupational Therapy Assistants ("COTAs") and Physical Therapy Assistants ("PTAs").

4844-5900-8991.1

behalf, all for the purpose of taking Select's patients and business at the Facilities; (4) Keeney and Kelly then recruited the Therapists to join in and complete the Scheme, using Select trade secrets--its patient lists and patient records and charts--to do so.

3.      In successfully recruiting the Therapists, EmpowerMe, Keeney and Kelly, on information and belief, used other misappropriated trade secrets of Select, set forth below.

4.      In sum, to perpetrate the Scheme, Kelly and the Therapists used their status as Select employees to engage in a series of disloyal, tortious, willful and outrageous acts on EmpowerMe's behalf, including:

> (a) misappropriating Select's trade secrets, including patient lists, charts, records and other patient information, to facilitate the transfer of Select patients to EmpowerMe and to give EmpowerMe and themselves an immediate revenue stream relating to those patients after transfer;
>
> (b) abruptly ending treatment of Select's patients by summarily and prematurely discharging them, thereby temporarily depriving patients of care in contravention of their approved plans of care and without the patients having met their short-term and/or long-term therapy goals. Among the patients Kelly and the Therapists prematurely discharged were those with dementia, memory care, Parkinson's and other serious issues, and those facing extreme fall or choking risks;
>
> (c) entering erroneous (and perhaps intentionally false) information in the patient records, particularly patient discharge information.  In fact, Kelly and the Therapists caused patients in each therapy discipline—physical, occupational and speech therapy—to have the same or virtually the same reason for their discharge, despite substantial difference in the patients' respective conditions and circumstances; and
>
> (d) misleading patients and their families while obtaining their authorization to transfer from Select to EmpowerMe, namely by presenting the transfer as a fait accompli, all without giving the patients or their families an informed and meaningful choice.

5.      As a consequence, Defendants have decimated Select's business at the Facilities. All (or virtually all) of Select's patients at the Facilities are now patients of EmpowerMe, with Kelly and the Therapists continuing to treat those patients for their new employer. (The only patient

4844-5900-8991.1

Select knows of  whom Defendants did not transfer to EmpowerMe is one who was recommended for hospice). Select patients transferred to EmpowerMe include individuals Kelly and/or the Therapists had claimed in patient records they were discharging because they purportedly no longer needed therapy services.

6.     Besides Select's patient lists, information and records, EmpowerMe threatens to use other of its trade secrets misappropriated by former employees of Select now employed with EmpowerMe.  These trade secrets will give EmpowerMe another means to unfairly compete with Select in Kentucky, and the other seven states in which they currently compete.

7.     Defendants' egregious misconduct gives rise to numerous independent claims:

- Kelly, the Therapists and EmpowerMe misappropriated Select's trade secrets, in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* (Count I), and the Kentucky Uniform Trade Secrets Act, K.R.S. §365.880 *et seq.* ("KUTSA") (Count II);

- Defendants engaged in a civil conspiracy to misappropriate Select's trade secrets, in violation of KUTSA (Count III)

- Kelly, by accessing and obtaining Select trade secrets and confidential and proprietary information from its computers, violated the Computer Fraud and Abuse Act, 18 U.S.C. §1030(a)(1*) et seq.* ("CFAA") (Count IV);

- The Individual Defendants, other than Keeney, breached their fiduciary duties of loyalty to Select. (Count V). While still employed by Select, Kelly solicited the Therapists to go to EmpowerMe.   While still employed by Select, Kelly and the Therapists then actively competed with it for Select's patients at the Facilities, successfully getting those patients to transfer to EmpowerMe;

- EmpowerMe and Keeney aided and abetted these breaches of fiduciary duty (Count VI);

- All Defendants tortiously interfered with Select's prospective business and economic advantage (Count VII) and with Select's existing business relationships (Count VIII);

- Each Defendant was unjustly enriched by disloyal activity at Select's expense (Count IX); and

3

- All revenue EmpowerMe, Kelly and the Therapists derive or have derived from the Select patients EmpowerMe improperly obtained should be placed in a constructive trust for Select's benefit (Count X).

8.    Because Defendants' conduct continues to unlawfully and unfairly jeopardize Select's rightful business, immediate and emergency injunctive relief is necessary, including a temporary restraining order ("TRO"), followed by a preliminary injunction.

## II.    PARTIES

9.    Plaintiff Select is a Delaware Limited Liability Company with its principal place of business located at 2600 Compass Road, Glenview, Illinois, 60026.

10.    Defendant EmpowerMe is a Kentucky Limited Liability Company with its principal place of business located at 300 Hunter Ave., St. Louis, Missouri, 63124. EmpowerMe is a direct competitor of Select with respect to therapy services, in Kentucky and at least seven other states, Illinois, Missouri, Kansas, Nebraska, Oklahoma, Georgia and Florida, either directly or through commonly-owned affiliates.  While EmpowerMe operates in Kentucky through the LLC named in this suit, more generally it and its affiliates operate out of St. Louis, Missouri and offer services under the umbrella name "EmpowerMe Wellness." https://www.empowermewellness.com.

11.    Defendant Keeney is an individual residing at 14009 Old Henry Trail, Louisville, Kentucky. Prior to resigning from Select, she had been its Agency Administrator, whose responsibilities, *inter alia*, included developing and maintaining Select's relationships with the Facilities.  In her Agency Administrator role with Select, she worked and developed close personal relationships with the Facilities' Directors, Kelly, and the therapists at the Facilities.[2] EmpowerMe

---

[2] The Facilities are not owned or operated by Select, which is a vendor thereto.  The Facilities' directors are therefore employees of the various Facilities.

currently employs Keeney as its Area Rehab Director, a position with duties that are similar to (if not the same) to those she had at Select, and with a similar (if not the same) geographic scope.

12.     Defendant Kelly is an individual residing at 236 Crestlake Way, Bowling Green, Kentucky. At all relevant times, Kelly was Select's Program Manager for the Facilities.  In that role he had: overall responsibility for Select's therapists and therapy services at the Facilities; close personal relationships with those therapists; and close personal relationships with the Facilities' Directors. Kelly also was a speech therapist who had direct relationships with certain Select patients at the Facilities. Kelly gave Select notice of his resignation on February 5, 2021 and resigned from Select effective February 19, 2021, and now is employed by EmpowerMe at the Facilities. On information and belief, he is fulfilling the same role for EmpowerMe at the Facilities that he previously held with Select.

13.     Defendant Parsley is an individual residing at 3539 Oil Well Rd., Glasgow, Kentucky 42141.  Parsley gave notice of her resignation on February 5, 2021, and resigned from Select effective February 20, 2021. Prior to resigning, she had been a PTA who treated Select patients at the Facilities. She now is employed by EmpowerMe.

14.     Defendant Kearny is an individual residing at 1333 Cardinal Lane, Bowling Green, Kentucky.  Prior to resigning from Select effective February, 20, 2021, she had been a COTA who treated Select patients at the Facilities. She now is employed by EmpowerMe.

15.     Defendant Boren is an individual residing at 331 State Route 853, White Plains, Kentucky. Boren gave notice of her resignation on February 5, 2021, and resigned from Select effective February 20, 2021. Prior to resigning, she had been a COTA who treated Select patients at the Facilities. She now is employed by EmpowerMe.

5

16.     Defendant Darnell is an individual residing at 196 Lovers Lane, Apt. B, Glasgow, Kentucky. Prior to resigning from Select, he had been a physical therapist working as a PRN (part time) and treated Select patients at the Facilities. He now is employed by EmpowerMe.

17.     Defendant Skinner is an individual residing at 3349 Sunburst Court, Bowling Green, Kentucky. Prior to resigning from Select effective February 20, 2021, he had been a physical therapist who treated Select patients at the Facilities. He is now employed by EmpowerMe.

18.     Defendant Hunt is an individual residing at 411 Fonso Circle, Bowling Green, Kentucky. Prior to resigning from Select effective February, 2021, she had been a speech pathologist employed by Select as a PRN (part time) who treated Select patients at the Facilities. She now is employed by EmpowerMe.

## III.    JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 (Federal Question), because the DTSA and CFAA are federal statutes that one or more Defendants have violated. All other claims herein arise out of the same operative facts as these violations of federal law, making it appropriate for the Court to exercise supplemental jurisdiction over them pursuant to 28 U.S.C §1367.

20.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), in that each Individual Defendant resides in this Judicial District, EmpowerMe does business in this District, which is the subject of this suit and the Defendants all committed tortious acts in this District.

6

## IV.    FACTS COMMON TO ALL COUNTS

### A.    Select Provides On-Site Therapy Services To Five AL/IL Facilities In Bowling Green

21.    GoodWorks operates 26 AL/IL facilities in Kentucky and Tennessee, including Massey Springs, one of the Facilities at issue.

22.    Prior to December 1, 2020, RehabCare Group, Inc. ("RehabCare"), provided therapy services on site at the Facilities.  On December 1, 2020, Select acquired RehabCare from Kindred Healthcare, LLC (the "Acquisition"). Thereafter, RehabCare merged into Select, which continued to provide these services on-site to patients at these five Facilities without interruption.

23.    One of these Facilities is Massey Springs, located at 2945 Smallhouse Rd., Bowling Green, Kentucky, 42104.

24.    The other Facilities at issue are: Morningside, located at 981 Campbell Lane, Bowling Green, Kentucky 42104; Arcadia, located at 618 Lovers Lane, Bowling Green, Kentucky, 42103; Charter, located at 445 Middle Bridge Road W., Bowling Green, Kentucky 42103 and Chandler, located at 2643 Chandler Dr., Bowling Green, Kentucky 42104.

### B.    EmpowerMe, With Select's Trade Secrets, Lures Away Select Employees With Responsibility For The Facilities, Including Kelly And The Therapists

25.    In or about November 2020, EmpowerMe commenced a campaign to recruit and hire away numerous Select employees across the states in which they compete.

26.    For example, in November of 2020,  EmpowerMe recruited a Staffing Coordinator of Select, Paula Vazquez ("Vazquez"), who was familiar with Select's staffing and recruitment practices and plans.

27.    Before leaving Select for EmpowerMe in December 2020, Vazquez accessed Select's confidential compensation rate ranges (minimum rate, average rate and maximum rate) for each therapy position across each of the eight States, including Kentucky, in which

EmpowerMe and Select compete, broken down further by whether the position was full-time, part time or PRN (the "Compensation Information").

28.    Vazquez then copied the Compensation Information and used it to prepare a spreadsheet  comparing Select's rates to EmpowerMe's, specifically referencing EmpowerMe's 2021 rates for the same therapy positions. Vazquez then forwarded this information to her personal email address in contravention of Select's policies and Vazquez's fiduciary duties.

29.    Vazquez is now a Recruiting Specialist for EmpowerMe, which involves the same (or nearly the same) staffing and recruiting roles as her position with Select; EmpowerMe therefore now possesses the Compensation Information.

30.    The Compensation Information gives EmpowerMe an unfair advantage in trying to lure away Select's existing therapy employees because it not only informs EmpowerMe what these employees made at Select, but also the highest hourly rate Select would pay them; the Compensation Information thus enables EmpowerMe to offer Select's existing therapy employees compensation at or above Select's top rate, in order to get them to quit Select and join EmpowerMe.  The same is true for new therapy employees for which the two companies will compete.

31.    EmpowerMe hired Keeney as Area Rehab Director in late December 2020 or early January 2021. Keeney had been employed as Select's Agency Administrator in Kentucky, where she was responsible for developing and maintaining Select's business there, including its business at the Facilities.

32.    Once at EmpowerMe, Keeney began to take steps to lure away Select staff and patients in Kentucky to EmpowerMe.  This staff included some with whom Keeney worked closely at Select, including Kelly.

33.     On information belief, Keeney began recruiting Kelly almost immediately after leaving Select in late December 2020 or early January 2021, and secured his cooperation in implementing the Scheme shortly thereafter.

**C.      In January 2021, Kelly Begins To Misappropriate Select's Trade Secrets, And Solicit The Therapists, While Keeney Gets EmpowerMe Access To Massey Springs**

34.     No later than January 4, 2021 -- more than a month before tendering his resignation to Select -- Kelly began transferring Select's confidential information about patients at the Facilities from its computers to his personal email for competitive purposes.  He did not have authority to do so.

35.     Specifically, on or about January 4, 2021, Kelly accessed a confidential chart regarding three Arcadia patients from Select's computers and transferred it to his personal email address. Kelly later emailed that chart to another Select employee from his personal email. (*See* email from M. Kelly to M. Kelly dated Jan. 4, 2021, attached hereto as **Exhibit 1**).

36.     On January 6, 2021, Kelly also sent a letter he had written to "Ken"—believed to be Ken Holland, GoodWorks' Director of Operations—from Select's computer systems to his personal email address. The letter discussed the "potential for ALFs [believed to be Assisted Living Facilities] to house their own therapy departments instead of outsourcing to third party therapy companies." (*See* email from M. Kelly to M. Kelly dated Jan. 6, 2021, attached hereto as **Exhibit 2**).

37.     Select is a third party therapy services company, so the letter Kelly wrote (and housed on Select's computer system) was contrary to Select's interests, and also violated Select's policies, detailed below.

9

38.    On January 27, 2021, Keeney forwarded GoodWorks an "Access Agreement" to sign, which would give EmpowerMe access to Massey Springs. At the same time, Keeney advised GoodWorks **"[a]s soon as we get these back we can start transitioning staff."** (See Email from M. Kelly to M. Kelly dated Feb. 1, 2021, attached hereto as **Exhibit 3**)(emphasis added).

39.    The Access Agreement alone, however, does not authorize EmpowerMe to treat any particular patients at Massey Springs.  Rather, the key to EmpowerMe getting patients at Massey Springs (or any other Facility) was to employ Select therapists with whom the patients were already working.

40.    Keeney therefore enlisted Kelly -- while he was still employed by Select -- in EmpowerMe's efforts to recruit Select therapy employees, including the Therapists. As Program Director, Kelly worked closely with the Therapists.

41.    On February 1, 2021, Keeney forwarded Kelly, at his personal email address, a list of EmpowerMe job links for Bowling Green. Notably, Vazquez had provided that list to Keeney. These job links were for: a full time SLP lead; a full time PTA; and full time COTA, PRN OT and PRN PT. Vazquez told Keeney these positions were "all open." (*See* email from M. Kelly to M. Kelly dated Feb. 1, 2021, attached hereto as **Exhibit 4**).

42.    On information and belief, in posting these positions and setting the compensation therefor, Vazquez used the Compensation Information and/or disclosed it to Keeney and/or Kelly in successfully soliciting the Therapists for EmpowerMe.

43.    On the same day, Kelly forwarded Vazquez's/EmpowerMe's list of "open" Bowling Green positions to his Select email address. (**Exhibit 4**).  By doing so, he caused information advertising Select's rival EmpowerMe's "open" positions *to be placed on Select's own computer system*.

44.    Also on February 1, 2021, Goodworks' Executive Director at Massey Springs forwarded Keeney's January 27, 2021 email (regarding the EmpowerMe Massey Springs Access Agreement) to Kelly at his Select email address; Kelly immediately forwarded it to his personal email address. (**Exhibit 3**).

45.    Also on February 1, 2021, Kelly accessed a confidential document from Select's computer systems entitled "Patient Frequency" and sent it to his personal email. This document is a Massey Springs patient list, and not only identifies Select's patients at Massey Springs but also shows the number of times per week that they were receiving treatment.

46.    On February 3, 2021, GoodWorks' Executive Director emailed Kelly at his Select address a list of nine Select patients, stating "**I have notified the following families about the change in therapy and told them you would be getting in touch with them**." She also wrote "**I will let you speak to the rest of them**." See email from M. Kelly to M. Kelly dated Feb. 3, 2021, attached hereto as **Exhibit 5**). Kelly forwarded this email to his personal email address on the same evening.

47.    This email indicates that: (1) while he had yet to resign from Select or notify it of his intent to do so, Kelly had decided to leave Select for EmpowerMe on or before that date; 2) Kelly had already told GoodWorks of that decision (but not Select); (3) Kelly decided to actively compete and actually began actively competing for Select's patients while still employed by it; and (4) neither the Select patients in question nor their families requested a change in their therapy providers; rather, Kelly notified Select patients at Massey Springs that their care was being transferred to EmpowerMe.

48.    Further, because many of patients listed in the email were not speech therapy patients whom Kelly could treat personally, the email strongly suggests that Kelly had already

decided to recruit the Therapists to join him at EmpowerMe on or before that date and/or begun said recruitment.

49.     On information and belief, Kelly had decided to leave Select for EmpowerMe as early as January 4, 2021 and began recruiting the Therapists for EmpowerMe shortly thereafter.

50.     Kelly gave Select notice of his resignation on February 5, 2021, which became effective February 19, 2021.

### C.     Kelly And Certain Therapists Give Select Two Weeks' Notice, Then Continue To Work At Select As Surreptitious Agents Of EmpowerMe By Prematurely And Summarily Discharging All Of Select's Patients, Immediately Ceasing Their Treatment And Often Putting Them At Significant Risk.

51.     At the time of Kelly's notice of resignation on February 5, 2021, Select had no idea that Kelly had already been targeting its patients, its therapists and its Facilities, nor that he would continue to do so before the date his employment with Select ended.

52.     Parsley and Boren each gave Select notice of their resignation on February 5, 2021, with the last date for each to be February 20, 2021.

53.     Kearny, Darnell, Skinner and Hunt did not give Select formal notice of their resignation. On information and belief they, like Parsley and Boren, had decided no later than February 5, 2021 to leave Select for EmpowerMe.  In fact, they all had stopped seeing patients no later than February 20, 2021, the effective date of Parsley and Boren's resignations.

54.     Kelly and the Therapists then used their remaining two weeks at Select to surreptitiously breach their fiduciary duties of loyalty to Select by stealing its patients and business at the Facilities for the benefit of EmpowerMe.

55.     As detailed below, between February 12-20, 2021, Kelly, Parsley, Boren, Kearny, Skinner, Darnell and Hunt began to summarily and prematurely discharge virtually all of Select's patients *en masse*[3] without clinical justification.

56.     The effect and presumptive purpose of Kelly and the Therapists' mass discharges of Select's patients were two-fold, to: (1) immediately and prematurely end Select's scheduled treatment of its patients and the revenue stream this provided to Select; and (2) to complete tasks necessary to prepare patients to be seen by EmpowerMe while still Select employees which, had they behaved lawfully, could not have been undertaken until they joined EmpowerMe, and therefore enable EmpowerMe (and themselves as its employees) to begin seeing patients and earning revenue from this promptly once they left Select.

57.     **However, another effect of the mass discharges was to cause patients to lose their therapy services for a time, putting many at risk of serious harm.  Many of these patients were supposed to be receiving therapy services multiple times each week, according to their plans of care.**

58.     The Discharge Summaries for Select's patients, which Kelly and the Therapists prematurely and improperly prepared while still employees of Select, demonstrate their unprincipled, hurried and likely inaccurate nature.

59.     First, the Discharge Summaries **use the same reasons for discharge**, irrespective of the patient or his/her individual circumstances. For example, as to Select's physical therapy patients, the Discharge Summaries generally gave **"financial issue"** as the reason.  For Select's occupational therapy patients, the Discharge Summaries generally gave "**part b Medicare**

---

[3] While Darnell was not seeing patients on February 16 and 17, 2021, the dates on which the other Therapists discharged the most patients, he was at Massey Springs on those dates and, on information and belief, was assisting with the discharges.

provider change" or **"payor change"** as the reason. For Select's speech therapy patients, the Discharge Summaries generally gave **"discharged to assisted living"** as the reason.  These discharge reasons are not based on the individualized needs of the patients.  Thus, Kelly and the Therapists have included what appears to be false information in the patient records.

60.    Outrageously, Kelly and the Therapists discharged patients who had not met short-term or long-term goals.  Certain Discharge Summaries expressly state that such goals were not met. For each patient whose short-term goal was not met, the patient's discharge stated that the reason for this was an "unexpected therapy change" or a "therapy change."

61.    Similarly, Kelly and the Therapists discharged Select's patients even though they had not completed plans of care, and often despite progress notes specifying that plans of care be continued. Patients were thus discharged despite serious medical conditions which required continuing care, such as fall risks (some extreme), dementia and memory issues, Parkinson's Disease, and swallowing issues (which create a possible choking hazard).

62.    A review of the Discharge Summaries Kelly and the Therapists prepared for patients at the Facilities, demonstrates that their disloyalty to Select and efforts for EmpowerMe put patients at risk:[4]

### 1.    Massey Springs

63.    Kelly and the Therapists' Discharge Summaries[5] for the Select patients at Massey Springs show, among other things:

- Patient 1 (PT patient) was primarily treated by Parsley as PTA  and was discharged by Skinner "for financial reasons" on February 16, 2021, even while making good progress, and even though 0 of 5 short-term goals and 0 of 6 long-term goals had been met.

---

[4] The dates of each discharge have been highlighted because they indicate the beginning of breaks in patient care.  A patient's particular risk category is also high

[5] For patient privacy reasons, Select has not attached the actual Discharge Summaries.

14

- Patient 2 (OT patient) was treated by Kearny as OT and was discharged by her on February 15, 2021, because of a "payor change." Patient was discharged even while making good progress, although 2 of 9 short-term goals and 3 of 11 long-term goals had been met. Patient's plan of care had been certified through February 28, 2021.

- Patient 3 (OT patient) was primarily treated by Boren as COTA and was discharged by Kearny on February 15, 2021, because of a "change in payor source." Patient's plan of care was certified through February 28, 2021, but patient was discharged even though 0 of 6 short-term and 0 of 8 long-term goals had been met, **and patient was a memory care patient with dementia and fall and safety issues.**

- Patient 4 (ST patient) was primarily treated by Hunt as SLP and was discharged by Hunt on February 18, 2021. No reason for the discharge was given and the record instead aptly shows "premature discharge from services." Patient's plan of care was certified through February 26, 2021 and patient was discharged even though 0 of 5 short-term goals and 0 of 7 long-term goals had been met, **and patient was a memory care patient with dementia.**

- Patient 5 (OT patient) was primarily treated by Boren as COTA and was discharged by Kearny on February 15, 2021, because of a "change in payor source." Patient's plan of care was certified through March 5, 2021, and patient was discharged even though only 4 of 9 short-term goals and 10 of 13 long-term goals had been met, **and patient was a memory care patient with dementia**.

- Patient 6 (ST patient) was primarily treated by Kelly and was discharged by Kelly on February 15, 2021. No reason was given for the discharge. Patient's plan of care was certified through February 26, 2021 and was discharged even though 2 of 4 short-term goals and 2 of 5 long-term goals had been met, **and patient was a memory care patient**.

- Patient 7 (PT patient) was primarily treated by Parsley and was discharged by Skinner on February 17, 2021, because of "financial reasons." Patient's plan of care was certified through February 16, 2021, but a progress note signed that date said to continue with the plan of care. Patient was discharged even though 0 to 5 short-term goals and 0 of 9 long-term goals were met.

- Patient 8 (OT patient) was primarily treated by Boren as COTA and discharged by Kearny on February 15, 2021, because of a "payor source change" even though patient's plan of care was certified through February 21, 2021, and 0 of 10 short-term goals and 1 of 10 long-term goals were met.

- Patient 9 (PT patient) was primarily treated by Parsley as PTA and was discharged by Skinner on February 17, 2021, for "financial reasons," even though 0 of 5 short-term and 0 of 8 long-term goals were met.

- Patient 10 (OT patient) was primarily treated by Boren as COTA and was discharged by Kearny on <u>February 15, 2021</u>, because of a "payor source change" even though plan of care was certified though plan of care was certified through February 21, 2021 and patient met 5 of 10 short-term goals and 8 of 9 long-term goals.

- Patient 11 (ST patient) was primarily treated by Hunt as SLP and was discharged by Kelly on <u>February 15, 2021</u>, because of "self discharge," without any reason being given, even though patient's plan of care had been certified through February 23, 2021 and patient had met only 1 of 5 short-term goals and 3 of 4 long-term goals.

- Patient 12 (PT patient) was primarily treated by Darnell and was discharged by Skinner on <u>February 15, 2021</u>, because of "financial reasons, as documented." However, there is no documentation in patient's file supporting this statement. Patient was discharged even though 0 of 5 short-term and 0 of 6 long-term goals were met.

- Patient 13 (OT patient) was primarily treated by Kathy Rice as OT and was discharged by Kearny on <u>February 20, 2021</u>, because of a "change in payor source," even though the patient had met only 1 of 6 short-term goals and 1 of 11 long-term goals, and even though patient's plan of care was certified through March 17, 2021.

- Patient 14 (PT patient) was primarily treated by Darnell as PTA and was discharged by Skinner on <u>February 17, 2021</u> for "financial reasons" even though patient had met only 2 of 5 short term goals and 0 of 4 long-term goals and **patient was a memory care patient with a documented concern for risk of falling**.

- Patient 15 (OT patient) was primarily treated by Boren and discharged by Kearny on <u>February 20, 2021</u> for a change in payor source, even though patient had only met 5/12 short term goals and 9 of 13 long-term goals and **patient was a memory care patient with a documented concern for risk of falling**.

- Patient 16 (PT patient) was primarily treated by Parsley and was discharged by Skinner on <u>February 17, 2021</u>, because of "financial reasons," even though patient's plan of care was certified through March 9, 2021; even though patient had only met 1 of 5 short-term goals and 0 of 7 long-term goals; and even though a progress note signed on February 17, 2021 recommended continuing with patient's plan of care and noted that good progress was being made.

- Patient 17 (OT patient) was primarily treated by Boren and was discharged by Kearny on <u>February 16, 2021</u>, because of a "change in payor source" even though patient's plan of care had been certified through February 28, 2021 and patient only met 6 of 11 short-term goals.

16

- Patient 18 (PT patient) was primarily treated by Parsley and discharged by Skinner on February 17, 2021, for "financial reasons," even though patient's plan of care had been certified through February 18, 2021 and patient had only met 0 of 5 short-term goals and 0 of 8 long-term goals. While financial reasons were listed, patient had approved of copay for therapy two times per week at time of initial valuation.

- Patient 19 (OT Patient) was primarily treated by Kathy Rice as OT and discharged by Kearny on February 16, 2021 with the reason given as patient request, even though patient's plan of care was certified through February 18, 2021 and patient had met 0 of 7 short-term and 0 of 7 long-term goals.

- Patient 20 (ST patient) was primarily treated by Kelly and discharged by Kelly on February 15, 2021 and listed as a "self discharge" without further reason given, even though only 2 of 5 shot-term goals and 2 of 3 long-term goals were met.

- Patient 21 (OT patient) was primarily treated by Boren and discharged by Kearny on February 15, 2021, for a "payor change," even though patient's plan of care had been certified through March 5, 2021 and patient had only met 2 of 10 short-term goals and 1 of 5 long-term goals, and even though **patient was a memory care patient with a high fall risk**.

- Patient 22 (PT patient) was primarily treated by Darnell and discharged by Skinner on February 17, 2021, for "financial reasons," even though patient's plan of care had been certified through February 24, 2021, and patient had only completed 2 of 5 short-term goals and 0 of 9 long-term goals, and even though **patient had a fall risk and history**.

- Patient 23 (PT patient) was primarily treated by Parsley and discharged by Skinner on February 16, 2021, for "financial concerns," even though only 0 of 5 short-term goals and 0 of 7 long-term goals had been met and **patient was a memory care patient**.

- Patient 24 (OT patient) was primarily treated by Boren and discharged by Kearny on February 16, 2021, because of "no insurance authorization," even though the patient had only met 5 of 8 short-term goals and 11 of 13 long-term goals, and **patient had a high fall risk and history and poor coordination**.

- Patient 25 (PT patient) was primarily treated by Parsley and discharged by Skinner on February 17, 2021, for "financial reasons," even though the patient's plan of care had been certified through February 22, 2021 and patient had only met 0 of 5 short-term goals and 0 of 8 long-term goals, and **patient had a high fall risk and history and poor coordination**.

- Patient 26 (OT Patient) was primarily treated by Boren and discharged by Kearny on February 17, 2021, for a "change in payor source", even though the patient's plan of care had been certified through February 28, 2021, and patient had only met

17

5 of 8 short-term goals and 3 of 14 long-term goals, and **patient had a high fall risk and history and poor coordination**.

- Patient 27 (ST patient) was primarily treated by Kelly and discharged by Kelly on February 15, 2021, for reason of a "self-discharge" with no further reason given, even though patient's plan of care had been certified through March 3, 2021, and patient had only met 1 of 4 short-term goals and 1 of 3 long-term goals and **patient had swallowing difficulty which created a risk of aspiration**.

- Patient 28 (PT patient) was primarily treated by Parsley and discharged by Skinner on February 17, 2021, for "financial reasons," even though the patient's plan of care had been certified through February 25, 2021, and patient had only met 0 of 5 short-term goals and 0 of 3 long-term goals, and had a medical condition that placed **patient at a high fall risk**.

- Patient 29 (OT patient) was primarily treated by Boren and discharged by Kearny on February 16, 2021, for reason of a "new payor source," even though patient's plan of care had been certified through February 28, 2021 and patient had met only 3 of 9 short-term goals and 12 of 14 long-term goals, and had a medical condition that placed **patient at a high fall risk**.

2.  **Arcadia**

64.    Kelly and the Therapists' Discharge Summaries for Select patients at Arcadia show, among other things:

- Patient 1 (PT patient) was primarily treated by Parsley and discharged by Skinner on February 15, 2021, for reason of "financial reasons" "with orders to be pursued with new payor source if and as ordered by physician," even though patient's plan of care had been certified through March 4, 2021, and patient had met only 0 of 5 short-term goals and 0 of 9 long-term goals, and **patient had a recent fall and injury** and an order signed February 15, 2021 (the day of discharge) had said to continue with patient's plan of care.

- Patient 2 (OT patient) was primarily treated by Boren and discharged by Kearny on February 18, 2021, for reason of a change in payor source even though patient's plan of care had been certified through February 19, 2021, and patient had met only 3 of 9 short-term goals and 6 of 10 long-term goals and patient's chart stated that patient was making good progress.

- Patient 3 (ST patient) was primarily treated by Kelly and discharged by Hunt on February 12, 2021, for reason of "refused/self-discharge" even though patient had only met 2 of 5 short-term goals and 2 of 4 long-term goals.

- Patient 4 (PT patient) was primarily treated by Parsley and discharged by Skinner on February 15, 2021, for "financial reasons," even though patient's plan of care was certified through March 2, 2021 and she had only meet 0 of 5 short-term goals and 0 of 10 long-term goals and even though patient had a medical condition that made **patient a fall risk** and a progress note signed on February 15, 2021 (the day of discharge) recommended patient continue the plan of care.

- Patient 5 (PT patient) was primarily treated by Parsley and discharged by Skinner on February 15, 2021, for "financial reasons," even though patient's plan of care was certified through March 7, 2021 and patient had only met 0 of 5 short-term goals and 0 of 6 long-term goals, and a progress note signed February 15, 2021 (the day of discharge) recommended patient continue the plan of care.

- Patient 6 (OT patient) was primarily treated by Boren and discharged by Kearny on February 18, 2021, because of a "change in payor source," even though patient's plan of care was certified through February 21, 2021 and patient had only met 2 of 5 short-term goals and 0 of 7 long-term goals and patient was **a memory care patient**.

- Patient 7 (PT patient) was primarily treated by Parsley and discharged by Skinner on February 15, 2021, for "financial reasons," but with the statement that "new orders/payors pursued if available," even though patient's plan of care was certified through February 22, 2021 and patient had only met 0 of 4 short-term goals and 0 of 7 long-term goals and was a **memory care patient with fall history**.

3.    **Morningside**

65.    Kelly and the Therapists' Discharge Summaries for Select's patients at Morningside show, among other things:

- Patient 1 (PT patient) was primarily treated by Parsley and discharged by Skinner on February 15, 2021, for "financial reasons," (stated at top of Discharge Summary, body is blank), even though patient's plan of care was certified through March 7, 2021 and patient had met 0 of 5 short-term goals and 0 of 7 long-term goals, and even though a progress note signed February 15, 2021 (the day of discharge) recommended continuing the plan of care and **patient suffers from dementia and has a high risk of fall**.

- Patient 2(ST patient) was primarily treated by Kelly and discharged by Hunt on February 15, 2021, as a "self discharge" with no reason given, even though patient had met only 1 of 4 short-term goals and 0 of 1 long-term goals and **suffers from dementia and has a high risk of fall**.

19

4.     **Charter**

66.     Kelly and the Therapists' Discharge Summaries for Select's patients at Charter show, among other things:

- Patient 1 (PT patient) was discharged by Skinner (no primary treating therapist is shown) on <u>February 15, 2021</u>, for "financial reasons" but her Discharge Summary also stated that the discharge was "pending orders for a new IE per [patient's] physician as ordered." Patient was discharged even though patient's plan of care was certified through March 11, 2021 and patient had met 0 of 4 short-term goals and 0 of 8 long-terms goals and even though patient's progress note signed February 15, 2021 (the day of discharge) said patient should continue the plan of care.

67.     Kelly and the Therapists discharged other patients at these facilities in February 2021, under suspicious circumstances, who now appear to be treated by EmpowerMe.

68.     Select last treated a patient at Charter on February 12, 2021 and Morningside and Arcadia on February 15, 2021.

69.     Select has not provided any services to a patient at Massey Springs since February 20, 2021. On that date, Kearny, the only OT regularly on-site for Select at Massey Springs, discharged all OT patients there.

70.      Kelly and the Therapists discharged virtually all Select patients at Massey Springs. Sixteen of these were OT patients (the one Select knows of who was not transferred was recommended to be transferred to hospice).

71.     Kelly and the Therapists discharged Select's patients at the Facilities while still Select employees. Kelly directed the Therapists to complete these discharges before they had resigned.

72.     Select patients Kelly and the Therapists improperly discharged from the Facilities are now receiving the same therapy services from EmpowerMe.

D.    **Kelly Uses His 2 Weeks' Notice Period to Misappropriate More Select Trade Secrets.**

73.    Although Kelly's resignation was to be effective February 19, 2021, his last day on site as a Select employee, however, was February 16, 2021. Kelly took his remaining three days as paid time off (PTO) which, contrary to Select policy, he approved for himself.

74.    On his last day, Kelly accessed Select's computer records and downloaded its plan of care, Discharge Summary and other records pertaining to a Parkinson's patient Select was treating for speech and language issues. Kelly then emailed these patient records to his personal email address. (*See* email from M. Kelly to M. Kelly dated Feb. 16, 2021, attached hereto as **Exhibit 6**).

75.    Notably, Kelly signed that patient's Discharge Summary that same day, noting that the patient's therapy goals were "Not met due to patient DC"—in other words, the goals were not met ***because Kelly had discharged the patient before they could be met***.

76.    Also on February 16, 2021, Kelly accessed Select's computer systems to obtain a Select document named "Orders and Insurance," which he again emailed to his personal address. (*See* email from M. Kelly to M. Kelly dated Feb. 16, 2021, attached hereto as **Exhibit 7**).

77.    The "Orders and Insurance" document contains substantial confidential patient information belonging to Select, including the therapy needs, payor information and holders of powers of attorney for *multiple* patients within various Facilities. It also includes requests for physician orders for a number of patients and EmpowerMe's consents for treatment for certain Select patients. Thus, while still employed by Select, Kelly was not only actively taking steps to steal its patients and transferring their personal health information to his personal email, he was maintaining on Select's computers the very EmpowerMe paperwork needed to transfer those patients.

21

78.    Also on February 16, 2021, Kelly emailed to his personal address a physician order for a Massey Springs patient. (*See* email from M. Kelly to M. Kelly dated Feb. 16, 2021, attached hereto as **Exhibit 8**).

79.    Kelly's downloading of the aforesaid Select information and transfer of it to himself, as well as his general use of Select's email and systems for personal and competitive purposes violated multiple employment policies of Select, including, its: Email Policy; its Electronic Workplace Policy; and HIPAA Privacy and Security Requirements.

E.    **Select Learns That Kelly And The Therapists Discharged Select's Therapy Patients En Masse Between February 12-20, 2021**

80.    On February 23, 2021, Scott "Drew" McKool-Solis, Select's Agency Administrator, called Parsley to discuss work matters.  Parsley advised McKool-Solis that (1) she had already resigned from Select and (2) EmpowerMe was now treating all patients at Massey Springs.

81.    Select then learned that Kelly and the Therapists had previously discharged virtually every Select patient at the Facilities [6].

82.    Hunt admitted to Select that the Therapists had been told to discharge all Select's patients "because we were transitioning to a new company," which would then treat the patients. Hunt further advised Select of her understanding that the "new company" had orders and consents to treat these patients, but would not say how she came to that understanding.

83.    Darnell refused to respond to Select's inquiries on the patient discharges.

84.    On February 23, 2021, an EmpowerMe Regional Vice President left a voicemail for  Joana Jeffries, Select's Regional Manager: (a) saying that the therapists who left Select for

---

[6] Select did not see any Chandler patients in February, so no patients were discharged there.

EmpowerMe were "uncomfortable" with Jeffries calling them about patients now under EmpowerMe's care; and (b) asking her to not to contact them again.

**F.    Kelly And The Therapists Use Improper And Unethical Tactics And Misuse Select's Trade Secrets And Confidential Information To Steal Select Patients And Advantage Themselves In Their Employment With EmpowerMe.**

85.    While Kelly was still an employee of and being paid by Select, Kelly actively competed with Select for Select's existing therapy patients by talking to patients and/or their families and informing them that EmpowerMe would be taking over their care, and obtained orders and/or consents for the same.

86.    Also, while still employed by Select, Kelly and the Therapists began to transfer Select's patients to EmpowerMe by summarily and prematurely discharging patients without a clinical justification.  Kelly's and the Therapists misconduct had the effect of speeding up the patient transfer process for EmpowerMe and enabling EmplowerMe to capture Select's revenue stream.

87.    When Kelly and/or the Therapists spoke to Select's patients or families to obtain their consents for the transfer, they necessarily had to access Select's patient lists and records for, among other reasons, the purpose of obtaining the name of the individuals who held powers of attorney for the patients.

88.    Kelly and the Therapists also had to access Select's computer system and the same Select patient lists and records to effect their discharges.

89.    In order to induce patients to transfer to EmpowerMe, Kelly and the Therapists exploited Select's Trade Secrets and HIPAA-protected information by, engaging in misconduct, including going into patient records, determining who held powers of attorney for patients, contacting those persons with powers of attorney and/or contacting patients themselves, all while on Select's payroll and as Select's employee.

23

90.     In doing so, Kelly and the Therapists accessed Select's patient lists and records without authority to benefit themselves and EmpowerMe at Select's expense.

91.     Kelly and the Therapists' active competition with Select while still employed was of great benefit to them and EmpowerMe.

92.     Had Kelly and the Therapists waited until after the effective dates of their resignations to fairly compete for Select's patients, they would not have been able to do so with Select's patient lists and information.

93.     To obtain Select's patient records (which are protected by the Health Insurance Portability and Accountability Act—HIPAA), EmpowerMe would have needed a Business Associates Agreement with Select, which it does not have. Instead, EmpowerMe tried to circumvent HIPAA by getting this information from Select's then current employees who, on information and belief, had already agreed to go work for EmpowerMe.

94.     Absent Kelly and the Therapists' misappropriation and unfair competition, EmpowerMe would have had to first wait until Kelly and the Therapists had left Select and joined EmpowerMe's employment to lawfully begin its effort to try to take patients from Select.

95.     EmpowerMe would then have to take multiple steps before EmpowerMe could lawfully obtain reimbursement from third party payor sources (such as Medicare) for any services it might provide to those patients, including: (1) obtain an order for services; (2) obtain a verification of the payor source; (3) obtain a verification of benefits; (4) obtain each patient's consent and other authorizations and permissions; (5) evaluate each patient  and set a plan of care; and (6) obtain physician approval for each plan of care. This process take several days, and in some instances weeks, to initiate services.

4844-5900-8991.1

96.     Here, by contrast, EmpowerMe exploited Select's existing patient lists and records as aforesaid, including its patient screenings and evaluations. Moreover, Kelly exploited Select Trade Secrets and HIPAA-protected information to go into patient records, determine who held powers of attorney for patients, contact those persons with powers of attorneys or patients themselves.

97.     Thus, by employing the unlawful means, EmpowerMe was able to immediately take Select's business.

98.     Based on statements by Parsley, it appears EmpowerMe began treating patients at the Facilities on February 21, 2021, the day after the last Therapist had left Select.

99.     The Facilities are not the only sites in Kentucky where EmpowerMe has used Select's trade secrets and confidential information to take business. EmpowerMe also took Select business at Creekside at Bardstown, a facility in Louisville, Kentucky, and Preston Green, a facility in Lexington.

100.    Through its employment of Vazquez, EmpowerMe now has access to Select's Compensation Information and there appears to be a significant threat that it will misuse, misappropriate and take unfair competitive of advantage of this to try to lure further employees away from Select in Kentucky and other States where they compete.

### COUNT I—Violation of the Defend Trade Secrets Act, 18 U.S.C. §1836 *et seq*.
(Against EmpowerMe, Kelly And The Therapists)

101.    Select realleges and incorporates paragraphs 1-100 above, as if fully set forth herein.

102.    Select's lists of patients, patient charts and patient records  are each trade secrets belonging to Select, within the meaning of the DTSA, 18 U.S.C §1836 *et seq*.

103.    Select's Compensation Information is also a trade secret belonging to Select, within the meaning of the DTSA.[7]

104.    Select has taken significant steps to protect and maintain its Trade Secrets, including through Select's policies, limits on access to trade secrets, use of encryption, server protections (including through the use of passwords), and implementing other protections and safeguards where Select houses its Trade Secrets.

105.    These Trade Secrets are not generally known in the industry and are not generally ascertainable by proper means.

106.    Select derives actual and potential economic value from its Trade Secrets. Specifically, Select builds its lists of patients through months and years of significant effort by the clinicians and others it employs; its patient charts reflect its therapeutic strategies and helps it to provide the best level of care for the patients it treats, and achieve superior therapeutic results, which, in turn helps it solidify its relationship with existing patients and its ability to maintain and expand relationships with the facilities responsible for those patients.

107.    The Compensation Information is central to Select's ability to build and maintain a stable workforce. This is especially important in a business dependent on serving individual clients and building personal relationships, as therapy services is.

108.    Select's Trade Secrets are related to a service used in or intended to be used in interstate commerce.

109.    EmpowerMe, through Kelly and the Therapists, misappropriated Select's Trade Secrets by accessing and using them without authority and knowing Kelly and the Therapists had

---

[7] Collectively, the patient lists, patient charts and records and Compensation Information are referred to as the "Trade Secrets."

acquired them through improper means, including but not limited to in flagrant violation of Select's Policies, Employee Handbook and Rules of Ethics.

110.    Kelly transferred patient lists, patient medical records, physician orders, and discharge summaries, among other things, to his personal email addresses.

111.    Kelly and the Therapists misappropriated Select's Trade Secrets.

112.    Defendants derived economic value from misusing Select's patient lists, patient charts and other medical records in order to take Select's patients by using Select's Trade Secrets.

113.    Besides the Trade Secrets EmpowerMe has misused and misappropriated, there is a threat it will misuse more, as it has improper access to Select's Compensation Information.

114.    Select has been injured as a direct and proximate result of the misappropriation of its trade secrets by EmpowerMe, Kelly and the Therapists and faces the threat of further injury from EmpowerMe.

WHEREFORE, SELECT prays that this Court

(a)    Grant a TRO, followed by a preliminary and permanent injunction restraining and enjoining EmpowerMe, Kelly, the Therapists and all persons acting in concert with them from directly or indirectly using or disclosing any of Select's Trade Secrets, as permitted by 18 U.S.C §1836 *et seq.*;

(b)    Grant Select compensatory and exemplary damages against EmpowerMe, Kelly and the Therapists, as permitted by 18 U.S.C. §1836 *et seq.*;

(c)    Grant Select its attorney's fees, as permitted by 18 U.S.C §1836 *et seq.;*

(d)    Grant Select its costs; and

(e)    Grant such other relief as this Court deems just in Select's favor.

## COUNT II—Violation Of The Kentucky Uniform Trade Secrets Act, K.R.S. §365.880 *et seq.*
### (Against EmpowerMe, Kelly And The Therapists)

115.     Select realleges and incorporates paragraphs 1-114 above, as if fully set forth herein.

116.     Select's list of patients, patient charts and other patient records at issue, along with its Compensation Information are each trade secrets belonging to Select, within the meaning of the KUTSA, K.R.S. §365.880.

117.     Select has protected and maintained the secrecy of its Trade Secrets.

118.     These Trade Secrets are not generally known in the industry and are not generally ascertainable by proper means.

119.     Select derives actual and potential economic value from its Trade Secrets.

120.     EmpowerMe, including through Kelly and the Therapists as its agents, made use of Select's patient lists, patient medical records and charts and other patient information in order to take Select's patients.

121.     Kelly, while employed by Select, without Select's knowledge or permission and in flagrant violation of Select's Policies,  Employee Handbook and Rules of Ethics, accessed Select's password-protected server and transferred patient lists, patient medical records, physician orders, and discharge summaries, among other things, to his personal email addresses.

122.     Kelly and the Therapists also accessed  Select's patient lists, patient charts, and other trade secret information, while they were Select employees, in order to transfer patients away from Select to EmpowerMe, to benefit themselves and EmpowerMe at Select's expense, and thereby misappropriated these Trade Secrets.

123.     EmpowerMe, including through using Kelly and the Therapists as its agents, unlawfully misappropriated and misused Select's Trade Secrets, and derived economic benefit therefrom, as aforesaid.

124.     Besides the trade secrets EmpowerMe has misused and misappropriated, there is a threat it will misuse more, as it has improper access to Select's Compensation Information.

125.     Select has been injured as a direct and proximate result of the misappropriation of its trade secrets by EmpowerMe, Kelly and the Therapists and faces the threat of further injury from EmpowerMe.

126.     The behavior of EmpowerMe, Kelly and the Therapists was and is wanton and willful and entitles Select to exemplary and punitive damages, in addition to compensatory and actual damages.

WHEREFORE, SELECT prays that this Court

(a)     Grant a TRO, followed by a preliminary and permanent injunction restraining and enjoining Defendants and all persons acting in concert with them from directly or indirectly using or disclosing any of Select's Trade Secrets, as permitted by the KUTSA, K.R.S. 365.800 *et seq.*;

(b)     Grant Select actual and compensatory and exemplary damages against Defendants, as permitted by K.R.S 365.800 *et seq.*;

(c)     Grant Select its attorney's fees, as permitted by K.R.S. 365.800 *et seq.*;

(d)     Grant Select its costs; and

(e)     Grant such other relief as this Court deems just in Select's favor.

## Count III- Conspiracy To Misappropriate Trade Secrets, In Violation Of KUTSA, K.R.S. §365.880
(Against All Defendants)

127.     Select realleges and incorporates paragraphs 1-126 above as if fully set forth herein.

29

128.    Defendants entered into an unlawful agreement whereby Kelly and the Therapists, while employees of Select, would instead act as EmpowerMe's agents to misappropriate and misuse Select's Trade Secrets to help them take Select's patients and make them patients of EmpowerMe.

129.    Pursuant to that unlawful agreement, Defendants in fact misappropriated and misused Select's trade secrets.

130.    Defendants engaged in a conspiracy to misappropriate Select's Trade Secrets.

131.    Select was damaged as a direct and proximate result of Defendants' conspiracy to misappropriate its Trade Secrets.

WHEREFORE, SELECT prays that this Court

(a)    Grant a TRO, followed by a preliminary and permanent injunction restraining and enjoining Defendants and all persons acting in concert with them from directly or indirectly using or disclosing any of Select's Trade Secrets, as permitted by the KUTSA, K.R.S. 365.800 *et seq.*;

(b)    Grant Select actual and compensatory and exemplary damages against Defendants, as permitted by K.R.S. 365.800 *et seq.*;

(c)    Grant Select its attorney's fees, as permitted by K.R.S. 365.800 *et seq.*;

(d)    Grant Select its costs; and

(e)    Grant such other relief as this Court deems just in Select's favor.

**Count IV—Violation Of The Computer Fraud and Abuse Act, 18 U.S.C.§ 1030 *et seq*.**
(Against Kelly)

132.    Select realleges and incorporates paragraphs 1-100 above, as if fully set forth herein

133.    Kelly intentionally accessed Select's computer systems to download Select trade secrets and confidential information from Select's system to his personal email addresses.

134.    Kelly had no authority to store or receive EmpowerMe documents on Select's system but maintained EmpowerMe consents and other forms on Select's system, which he then downloaded to his personal email addresses. Kelly maintained EmpowerMe's information for the purpose of helping EmpowerMe take patients and business from Select and to help EmpowerMe, his new employer, and himself, at Select's expense.

135.    Kelly also maintained on Select's system a letter he planned to send to Select's client encouraging it to not use third party therapy service providers, like Select. Kelly had no authority to store this on Select's system.

136.    Kelly exceeded his authority in accessing Select's computer system for the purpose of downloading trade secrets and confidential information belonging to Select. Not only did he have no authority to do this, but Kelly also flagrantly violated numerous express prohibitions of this contained in Select's policies. Kelly's transfer of patient records to an unencrypted and unprotected email address likely also violated HIPAA and Kelly absolutely had no authority to so flout this statute.

137.    Kelly obtained data from Select's computer system through his unlawful acts.

138.    Select lost more than $5,000 in business as a direct and proximate result of Kelly's unauthorized use of Select's computer system.

WHEREFORE, SELECT prays that this Court

(a)    Grant a TRO, followed by a preliminary and permanent injunction, restraining and enjoining Kelly and all persons acting in concert with him from directly or indirectly using or disclosing any of the information which Kelly obtaining through his violations of the Computer Fraud and Abuse Act;

31

(b)    Enter judgment for Select, awarding Select the recovery of its losses caused by Kelly's violation of the Computer Fraud and Abuse Act, including attorney's fees and costs to the extent permitted by law; and

(c) Grant such other relief as this Court deems just in Select's favor.

## Count V—Breach of Fiduciary Duty of Loyalty
### (Against Kelly And The Therapists.)

139.    Select realleges and incorporates paragraphs 1-100 above, as if fully set forth herein.

140.    While Kelly and the Therapists were employed by Select, each owed a duty of undivided loyalty to Select. That included a duty to act in Select's best interests, to avoid conflicts of interests and to refrain from self-dealing, including but not limited to actively competing with Select while still employed. Charged with this duty, Select reposed trust in these defendants and entrusted them with its patients and with access to trade secrets and confidential information in order to care for those patients.

141.    In flagrant breach of his duty of loyalty, Kelly, while still an employee of Select and on its payroll, actively recruited and induced the Therapists to leave Select for its direct competitor, EmpowerMe, and to assist him in actively competing for/stealing Select's patients for EmpowerMe.

142.    Kelly and each of the Therapists, in flagrant breach of their duties of loyalty while still employed, then contacted Select's patients in active competition with Select and induced them to leave Select for EmpowerMe.

143.    Kelly and the Therapists, as aforesaid, also summarily and prematurely discharged Select's patients so that EmpowerMe could more quickly service them.

144.    Kelly and each of the Therapists acted with the intent to harm Select or with reckless disregard to the fact that this would happen.

145.    Only after causing Select to lose its patients at the Facilities and its business to its rival EmpowerMe and only after misappropriating and/or misusing Select's records, did Kelly and the Therapists each resign or otherwise leave employment at Select.

146.    Brazenly, Kelly took paid time off, which he himself improperly authorized, after engaging in the misdeeds at issue.

147.    Select has been and will be injured as a direct and proximate result of Kelly and the Therapists' breaches of their duty of loyalty.

148.    Select has a right to recover damages because of Kelly's and the Therapists" breaches of their duties of loyalty. Because of the wanton and willful nature of their breach, Select is entitled to exemplary and/or punitive damages in addition to its actual and compensatory damages.

WHEREFORE, SELECT prays that this Court enter judgment in Select's favor and against Kelly and the Therapists, jointly and severally:

(a)    awarding Select its actual and compensatory damages;

(b)    ordering Kelly and the Therapists to disgorge to Select the amount of compensation and benefits they were paid during the period of their disloyalty;

(c)    awarding Select punitive and/or exemplary damages because of the wanton and willful nature of their misconduct.

(d)    awarding Select its costs; and

(e)    granting Select such other relief as this Court deems just in its favor.

### Count VI—Aiding and Abetting Breach Of Fiduciary Duty
(Against EmpowerMe And Keeney)

33

149.    Select realleges and incorporates paragraphs 1-100 and 139-148 above, as if fully set forth herein.

150.    Kelly and the Therapists are each liable for breaches of their individual duties of loyalty owed Select.

151.    At all relevant times, Keeney and EmpowerMe were aware of the fiduciary duties of loyalty owed by Kelly and each of the Therapists to Select. Similarly, at all relevant times, Kelly was aware of the fiduciary duties each of the Therapists owed to Select.

152.    By their conduct as aforesaid, Keeney,  EmpowerMe knowingly and substantially assisted in, or induced, Kelly and the Therapists' breaches, by among other things, enlisting them to actively solicit and obtain Select's patients for EmpowerMe while still employed by Select. These acts of aiding, abetting and/or inducing enabled EmpowerMe to steal patients for itself and launch itself as Select's replacement the day after Kelly and the Therapists had left Select and the day they started work with EmpowerMe.

153.    By his conduct as aforesaid, Kelly knowingly and substantially assisted in, or induced, the Therapists' breach of their fiduciary duties, by among other things enlisting them in his efforts to actively solicit and obtain Select's patients, for EmpowerMe while still employed by Select.

154.    Keeney has benefitted individually from the aforesaid breaches because she has an incentive to develop business for EmpowerMe in Kentucky and elsewhere and stands to profit financially or receive a desired transfer from such results.

155.    Select suffered damage as a direct result of  Keeney and EmpowerMe's inducement of and abetting of Kelly's and the Therapists' breaches of their duties of loyalty.

WHEREFORE, SELECT prays that this Court enter judgment in Select's favor and against Keeney and EmpowerMe jointly and severally:

(a)    awarding Select its actual and compensatory damages;

(b)    awarding Select punitive and/or exemplary damages;

(c)    awarding Select its costs; and

(d)    granting Select such other relief as this Court deems just in its favor.

### Count VII—Tortious Interference With Prospective Economic Advantage
(Against All Defendants)

156.    Select realleges and incorporates paragraphs 1-100 and 139-155 above, as if fully set forth herein.

157.    Select had a valid business relationship with the Facilities to provide therapy services for its patients, including PT, OT and ST.

158.    Select had a legitimate expectation that its business relationship with the Facilities would continue.

159.    Each Defendant was fully aware of the relationship Select had with the Facilities and stood to enjoy, but for their interference.

160.    Defendants, through the acts described above, acted with malice and wanton, willfully and intentionally interfered with Select's existing and prospective business relationship with the Facilities.

161.    Select has been injured as a direct result of Defendants' interference with its prospective business relationships.

WHEREFORE, SELECT prays that this Court enter judgment in Select's favor and against Defendants, jointly and severally:

4844-5900-8991.1

(a)     awarding Select its actual and compensatory damages;

(b)     awarding Select punitive and/or exemplary damages;

(c)     awarding Select its costs; and

(d)     granting Select such other relief as this Court deems just in its favor.

## Count VIII—Tortious Interference With Business Relationships
(Against All Defendants)

162.     Select realleges and incorporates paragraphs 1-100 and 139-161 above,  as if fully set forth herein.

163.     Select had a valid business relationship with the patients to provide therapy services, including PT, OT and ST, in exchange for reimbursement by the payor(s) on their behalf.

164.     Select had a legitimate expectation that its business relationship with these patients would last.

165.     Each Defendant was fully aware of the relationship Select had with the Facilities and stood to enjoy, but for their interference.

166.     Defendants, through the acts described above, acted with malice and wanton, willfully and intentionally interfered with Select's existing relationships with these patients

167.     Select has been injured as a direct result of Defendants' interference with its business.

WHEREFORE, SELECT prays that this Court enter judgment in Select's favor and against Defendants, jointly and severally:

(a)     awarding Select its actual and compensatory damages;

(b)     awarding Select punitive and/or exemplary damages;

(c)     awarding Select its costs; and

36

(d)      granting Select such other relief as this Court deems just in its favor.

### Count IX—Unjust Enrichment
(Against EmpowerMe, Kelly And The Therapists)

168.     Select realleges and incorporates paragraphs 1-100 and 139-167 above, as if fully set forth herein.

169.     EmpowerMe, Kelly and each of the Therapists, through their wrongful conduct, have taken patients and business from Select which they would not have been able to do had they behaved lawfully and properly. Accordingly each of these Defendants was unjustly enriched, as each has enjoyed the financial reward for taking business that Select should have enjoyed and be enjoying. This includes any payor reimbursement received by EmpowerMe for any Select patients it has improperly acquired and any hourly pay, bonus or other remuneration received by Kelly or any Therapist for the treatment of patients who should rightfully have remained with Select but for their misconduct

170.     It would be highly inequitable and unjust for the Defendants to retain the fruits of their misconduct at Select's expense.

WHEREFORE, SELECT prays that this Court enter judgment in Select's favor and against Defendants, jointly and severally:

(a)      awarding Select its actual and compensatory damages;

(b)      awarding Select punitive and/or exemplary damages;

(c)      awarding Select its costs; and

(d)      granting Select such other relief as this Court deems just in its favor.

## Count X- Constructive Trust
### (Against EmpowerMe, Kelly and the Therapists)

171.    Select realleges and incorporates paragraphs 1-100 and 139-170 above, as if fully set forth herein.

172.    EmpowerMe, Kelly and each of the Therapists, through their wrongful conduct, have taken patients and business from Select that, had they behaved lawfully and properly, they would not have received. Accordingly each of these Defendants was unjustly enriched, as they have enjoyed ill-gotten financial reward for taking business that Select should have enjoyed and be enjoying. This includes any payor reimbursement received by EmpowerMe for any Select patients it has improperly acquired and any hourly pay, bonus or other remuneration received by Kelly or any Therapist for the treatment of patients who should rightfully have remained with Select but for their misconduct.  Such amounts should be held in trust for the benefit of Select in order to prevent these Defendants' unjust enrichment.

WHEREFORE, Select prays that this Court enter judgment in its favor and against Defendants:

(a)    requiring that any proceeds obtained by each of these Defendants, by way of payor reimbursement for Select patients to EmpowerMe or any hourly rate, bonus or other remunerative benefit for Kelly and the Therapist, be disgorged by these Defendants and held in trust for the benefit of Select in order to prevent these Defendants' unjust enrichment; and

(b)    granting Select such other and further relief in its favor as the Court deems just.

Dated: March 9, 2021

Respectfully Submitted,

Diane Gianos Walker (*pro hac vice* to be filed)
Kristen Wolfe Roberts (*pro hac vice* to be filed)

4844-5900-8991.1

Robert Smeltzer (*pro hac vice* to be filed)
WALKER MORTON LLP
Two Prudential Plaza
180 North Stetson Avenue, 47th Floor
Chicago, IL 60601
Telephone: (312) 471-2900
Facsimile: (312) 471-6017
dwalker@walkermortonllp.com
kroberts@walkermortonllp.com
rsmeltzer@walkermortonllp.com


David B. Goroff (*pro hac vice* to be filed)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 3000
Chicago, IL  60654
Telephone:  (312) 832-4500
Facsimile:  (312) 832.4700
dgoroff@foley.com

and

/s/ T. Kent Barber
KY Bar No. 092456
Barber Law PLLC
2200 Burrus Dr.
Lexington, KY 40513

*Attorneys for Select Rehabilitation, LLC*

4844-5900-8991.1

## VERIFICATION

Pursuant to 28 U.S.C. § 1746 and under penalties of perjury, the undersigned states that the foregoing factual allegations are true and correct, except as to matters stated on information and belief, and as to such matters I states that I verily believe the same to be true to the best of my knowledge, information and belief.

SELECT REHABILITATION, LLC

By: _____

      Glenda Mack, Executive Vice
      President (as to all paragraphs)

Executed on: March 9, 2021

4844-5900-8991.1